UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| LORETTA DIBRINO, | : |  |
| Plaintiff, | : |  |
|  | : | 3:01-cv-2407 (JCH) |
| v. | : |  |
|  | : |  |
| ANTHONY J. PRINCIPI, | : |  |
| SECRETARY OF VETERANS | : | JANUARY 5, 2004 |
| AFFAIRS | : |  |
| Defendant. | : |  |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 26]

This action is brought by Loretta DiBrino, a former employee of the United States Department of Veterans Affairs, against Anthony J. Principi, Secretary of Veterans Affairs, in his official capacity. She asserts various claims arising from her alleged disability, her employer's response, and her eventual termination. The defendant has moved for summary judgment. For the following reasons, the motion is granted.

## I.    BACKGROUND[1]

DiBrino is a veteran who began her employment as a Medical Clerk with the department of Veterans Affairs in West Haven, Connecticut, in 1993. During that time she suffered from a low back injury.

---

[1]For the purpose of deciding the motion for summary judgment, the court accepts the plaintiff's version of all disputed facts. Because the Complaint and plaintiff's Opposition set forth little in the way of a coherent description of events and allegations, the court has gleaned the facts of this case from various exhibits, including the deposition of the plaintiff, as well as the plaintiff's pleadings, in order to fully consider the plaintiff's best case as required on this motion.

-1-

A.    **The Cane Incident**

On June 4, 1997, the plaintiff, at the direction of her physician, Dr. Beverly Greenspan, requested that she be allowed to use a cane on the job and that she not be required to lift or carry more than 15 pounds. Her supervisor, Kathleen Yuckienuz, Nursing Supervisor, said DiBrino "wasn't going to work with a cane unless she had a doctor's note." Pl.'s Opp. at 1. According to the plaintiff's affidavit:

> When I reported to work I went to my supervisor with my cane – I had my cane in my hand – to find out what my assignment is that evening. . . . As soon as she saw me she questioned me as to why I had a cane and said to me, "You can't work here with a cane. We didn't hire you with a cane. We need people who can walk from floor to floor. I'm going to send you home and charge you sick leave, and you can't come back here unless you have a doctor's note.
> . . . .
> A few minutes later she called me back into her office and said she called her supervisor, Linda Titus, and she agreed. I could not work here with a cane, and I would have to come back with a doctor's note.
> . . . .
> I said, can I call my doctor right now and have her send you a message, a doctor's note. And she said yeah.

Pl.'s Aff. at 9-10, Ex. 1, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. DiBrino further explained that she was told, "when and if she got [the note], she was going to let me go back to work." Id. at 13.[2]

_____

[2]In her Affidavit, plaintiff suggests that this treatment regarding her request to use a cane was "harassment" in retaliation for a series of non-disability-related events that occurred on the ward in 1996; DiBrino relates that she was working on the psychiatric ward when a patient escaped, and that a co-worker advised her "they want to put the blame on you." Pl.'s Aff. at 18, Ex. 1, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. She was never admonished or disciplined for the incident. Id. at 22. This incident is not mentioned in her Complaint or Opposition to Summary Judgment.

DiBrino contacted her physician, who said she would email Yuckienuz.

Yuckienuz "wait[ed] for the message to come into her computer," and according to

DiBrino, "she sent me off, told me to go somewhere else until she notified me she

received the message." Dr. Greenspan's email explained that she had prescribed a

cane for DiBrino, and that the plaintiff's "gait was normal in the clinic and I feel that

she is physically able to do clerical work including walking from one part of the

hospital to another carrying charts, but she should not lift more than 15 lbs. because

of her chronic back problem." Email from Dr. Beverly Greenspan, Ex. B.,

Defendant's Local Rule 56(a)(1) Statement [Dkt. No. 28].

About an hour elapsed between the time DiBrino encountered Yuckienuz with

the cane and when Dr. Greenspan issued the note. Dep. of Loretta DiBrino at 61,

Ex. 3, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. During that time, DiBrino

encountered a co-worker, who suggested she talk to the union. DiBrino called the

union office and talked to Donna Bennett, who also called the plaintiff's supervisor.

Id. at 12.

DiBrino then called Yuckienuz, who informed her "that she got the note, and

gave me my assignment." Dep. of Loretta DiBrino at 70, Ex. 3, Pl.'s Local Rule

56(c)(2) Statement [Dkt. No. 31]. DiBrino used the cane some at work that day.

Id. After that date, she was never told that she could not use the cane. Id. at 80.[3]

---

[3] DiBrino did not use the cane after June 4 because she says she wanted further clarification
from Yuckienuz, and was "afraid to bring it up." Dep. of Loretta DiBrino at 75, Ex. 3, Pl.'s Local

DiBrino filed an EEO report. See EEO Counselor's Report, Ex. 4, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. The report indicates that "first contact" was June 3, 1997, a day before the incident with Yuckienuz; the "Background Information" section states that DiBrino initiated the informal EEO counseling session on August 8, 1997, and reports that she had talked to another counselor on June 30, 1997. The report stated that the issue regarding the cane had been resolved, "apparently [by] the union representative." Id. at 2. In any case, DiBrino told the EEO counselor that she wanted an apology from Yuckienuz "and assurances that this type of incident will not happen again to any employee by indicating to all employees the rights of the disabled employees." Id. The counselor interviewed Yuckienuz, who said that she would apologize to the plaintiff and would disseminate documentation regarding the rights of disabled employees. Id. at 3. In the final interview, DiBrino stated that she wanted written apologies from Yuckienuz and Titus as well, "in addition to the employee rights memorandum previously requested," and $300,000 in compensation for the "humiliation she has endured." Id. The final interview was conducted on September 10, 1997.

The plaintiff claims that after the EEO complaint, her shift assignment was changed, such that she was "assigned to alternating shifts during the same week," and

---

Rule 56(c)(2) Statement [Dkt. No. 31]. She tried to bring up the incident at a meeting with Yuckienuz and a union representative two weeks later and was told, "as far as the union is concerned it's a dead issue." Id. at 78.

"no other ward clerk was automatically assigned to this schedule." Pl.'s Opp. at 2.
She also alleges that she was subject to intense supervision and micromanagement
after she filed the complaint. See, e.g., Aff. of Joanne Frasure at 24, Ex. 5, Pl.'s
Local Rule 56(c)(2) Statement [Dkt. No. 31].

### B.    The Problem With Oliverio

Around June 10, 1999, over two years after the dispute surrounding the cane,
DiBrino began to feel that she was being harassed and stalked by Michael Oliverio, a
Nursing Assistant/Escort. DiBrino had a practice of retrieving recyclable cans from
areas of the hospital and saving them to redeem for money. She stored them in a fire
extinguisher closet and allegedly discovered empty liquor bottles in the closet. She
also noticed that Mr. Oliverio smelled of alcohol. She felt that Mr. Oliverio began to
follow her and even trailed her in his car on several occasions after she had left work.
She reported these incidents to West Haven Police and hospital security. See Pl.'s
Opp. at 2-3.

DiBrino complained to Yuckienuz, who held a meeting with DiBrino,
Oliverio, and two union representatives on July 30, 1999. Compl. at ¶ 11. DiBrino
complained again on December 2, 1999, this time to Linda Titus, who held another
meeting with DiBrino, Oliverio, and others. Compl. at ¶ 13. DiBrino made
additional complaints in February and July of 2000.

In July 2000, the hospital made various provisions to remedy the situation,

including: (1) for DiBrino to contact the supervisor at any time when she was feeling harassed, and for the nursing supervisor then to check with Oliverio to see why he was in the area and to report back to DiBrino if the reasons were valid; (2) arranging shifts and supper breaks, so "except for break times there should be no other time she is off the unit and runs into Mike"; and (3) for Oliverio not to respond to calls from DiBrino's assigned area. 7/29/00 Email of Kathleen Yuckienuz, Ex. 6, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. Yuckienuz's email noted, "Linda has requested that we all act immediately on Lorretta's complaints and followup with Mike. Hopefully the reassignment of Loretta will help to decrease or preven[t] these." Id.

C.    **Termination**

On September 21, 2000, DiBrino's psychiatrist recommended that she take an absence from work to recover from anxiety and depression. See Dr. Burton G. Austen Mem., Ex. 6, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. DiBrino attempted to give Dr. Austen's note to the Employee Health Office at the VA Hospital, but ultimately handed the note to Pat Boucher, Nursing Supervisor. Pl.'s Dep. at 144, Ex. A, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28]. She did not report to work thereafter. Id. at 141.

Linda Titus received the documentation and wrote a letter to DiBrino on October 18, 2000. She explained, "[Boucher] has indicated that in your telephone

conversation with her, you stated that authorized absence is the only form of leave which you are interested in," but "it is not within my scope of authority to approve authorized absence." 10/18/00 Letter from Linda M. Titus to Lorretta DiBrino, Ex. 9, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. Titus confirmed that she had forwarded the request to the Healthcare Systems Director, who could approve the absence. Id. Titus further informed DiBrino that, during the first two weeks of her absence, "you were held in sick leave status in order to minimize the adverse affect to your salary." Titus further explained, "if you want to have your sick leave restored, and changed to Leave Without Pay, it will be corrected upon receipt of your written request." Id. At the time of the letter, with sick leave presumably exhausted, Titus told DiBrino that, pending the Healthcare Systems Director's decision on her request for Authorized Absence, "you are being held in an administrative AWOL status. Should he disapprove your request, your leave status will continue to be AWOL, in the absence of any OWCP claim or an approved request for other appropriate leave." Id.

On November 8, 2000, DiBrino wrote a letter requesting that all sick and annual leave time run until exhausted. 11/8/00 Letter from Loretta DiBrino to Nancy Cabanas, Chief, Human Resources, Ex. 11, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. She further requested that "once such benefits are exhausted, I be placed on leave without pay until my Doctor clears me for return to

work." Id.

Cabanas replied to DiBrino's attorney on December 6, 2000, alerting him and the plaintiff to the need to file a Family Medical Leave Act form in order to receive Leave Without Pay under the Act. 12/6/00 Letter from Nancy Cabanas to Robert Reger at 1, Ex. 12, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. It further noted that, though DiBrino was currently AWOL due to the lack of any approved leave, "AWOL charges will not be used to support adverse action . . . in order to give her additional time to comply with the necessary paperwork." Id. The letter also outlined a procedure made to "reduce paperwork for Ms. DiBrino." Id.

Reger replied on January 5, 2001, with an updated physician's report and a release for obtaining necessary medical information. 1/5/01 Letter from Robert Reger to Nancy Cabanas, Ex. 13, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. He forwarded the completed forms to Yuckienuz on February 2, 2001. 2/2/01 Letter from Robert Reger to Kathleen Yuckienuz, Ex. 14, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. DiBrino was granted provisional Leave Without Pay pending the resolution of her claim with OWCP. When that claim was denied, the leave was changed to AWOL. 5/22/01 Letter from Mark Bain, Chief, Human Resources Management Service, to Robert Reger, Ex. 21, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31].

On May 5, 2001, Mark Bain, Chief of Human Resources Management Service

for the West Haven VA, informed DiBrino's attorney that due to the denial of her claim, her status had again been changed to AWOL. Id. He told Reger that "it has been almost eight months since your client has reported to duty," and that the plaintiff needed to submit information regarding status updates and nature of her condition, requested five months earlier. He further informed Reger, "[y]our client's continued and protracted absence, as well as her continued failure to maintain contact with her supervisor, may result in action up to and including removal from employment." Id.

Almost a year later, on March 8, 2002, the Department of Veterans Affairs gave DiBrino 30 days notice of its intent to remove her from her employment because of her failure to follow proper leave requesting procedures, failure to follow a direct order by a supervisor, and failure to provide administratively acceptable documentation to support her absence. 3/8/02 Notice, Ex. F, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28]. DiBrino does not suggest that she responded to this notice. See, e.g., Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. On April 10, 2002, DiBrino was informed that she had been terminated. 4/10/02 Notice, Ex. G, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28].

## II. DISCUSSION

### A. Standard

The role of the court on summary judgment is "not to try issues of fact, but

only to determine whether there are issues of fact to be tried." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present such evidence that would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255. "Summary judgment is improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." Lucente v. Int'l Bus. Mach. Corp., 310 F.3d 243, 253 (2d Cir. 2002).

The plaintiff, however, cannot escape summary judgment merely by asserting that unspecified disputed material facts exist or through conjecture or speculation. Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2001). If little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate. Gallo v. Prudential

Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994). Disputed

facts that are not material to the issues in the case may not defeat summary judgment.

Hemphill v. Schott, 141 F.3d 412, 416 (2d Cir.1998). See also Anderson, 477 U.S.

at 247-48 (the "mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact").

> **B.    Retaliation Claim**

The elements of a retaliation claim under § 504 of the Rehabilitation Act are:

(i) plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that

plaintiff was involved in protected activity; (iii) an adverse decision or course of

action was taken against plaintiff; and (iv) a causal connection exists between the

protected activity and the adverse action. Weixel v. Bd. of Educ. of City of New

York, 287 F.3d 138 (2d Cir. 2002). Retaliation claims are analyzed under the same

burden-shifting framework established for Title VII cases. See Treglia v. Town of

Manlius, 313 F.3d 713 (2d Cir. 2002).

In order to defeat a motion for summary judgment on a retaliation claim, the

plaintiff must first present sufficient evidence to establish a prima facie case. Cifra v.

G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001). To do so, the plaintiff must present

sufficient evidence to permit a rational trier of fact to find the four elements listed

above. Id. (internal citations omitted); see also Fitzgerald v. Henderson, 251 F.3d

345, 358 (2d Cir. 2001).  Though plaintiff's Complaint and Opposition to Summary

Judgment are unclear, she alleges at most that, in retaliation for her complaint to the

EEO and, later, her filing of this suit, that she was (1) monitored more closely by her

supervisor, or "micromanaged"; that (2) her supervisors discriminated against her

with regard to working conditions; (3) that her dispute with Oliverio, another

employee, was not resolved satisfactorily; that (4) that her supervisors did not help

her process her leave requests; and (5) that she was ultimately terminated.  For the

purposes of this motion, the court assumes that her complaints were protected and

that the defendant had notice of them.  Weixel, 287 F.3d at 148.

### 1.    Supervisor Harassment

First, DiBrino alleges that she was "harassed" by her supervisors, after the

incident with the cane, for filing her EEO complaint.  She presents a co-worker

affidavit, testifying that DiBrino's supervisors monitored her calls, whereabouts, and

computer use.  Aff. of Joanne Frasure, Ex. 5, Pl.'s Local Rule 56(c)(2) Statement

[Dkt. No. 31].  DiBrino's supporting facts are sparse, essentially limited to this

statement under oath without any additional specifics.  Moreover, DiBrino also

indicates in her Affidavit that the scrutiny began before the complaint, as a result of

her supervisors' attempts to blame her for an event that occurred in 1996.  Pl.'s Aff. at

29, Ex. 1, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31].

Even if this claim of monitoring was linked exclusively to her complaint about

the cane, however, it would not present a "materially adverse" change in working conditions. Excessive scrutiny does not constitute adverse employment action absent other negative results. See Honey v. County of Rockland, 200 F. Supp. 2d 311, 320-21 (S.D.N.Y. 2002). As discussed above, "not every unpleasant matter short of [discharge or demotion] creates a cause of action" for retaliatory discharge." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997)(quoting Welsh v. Derwinski, 14 F.3d 85, 86 (1st Cir. 1994). Monitoring is in theory a legitimate supervisory function, and does not entail the same quality of harassment that the Second Circuit had found actionable in cases like Richardson, where fellow employees were shooting rubberbands at the plaintiff and putting hair in her food, among other things. Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426 (2d Cir. 1999). Nor does DiBrino allege that she lost benefits, just that she was more closely monitored in her activities. See Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

### 2.    Working Conditions

DiBrino also alleges for the first time in her Opposition Memorandum that, after her initial complaint, her supervisor changed her work schedule, "assigning her to alternating shifts during the same week. . . although no other ward clerk was automatically assigned to this schedule, and that this continued until April 2000." Pl.'s Opp. at 2. She does not attach any exhibits or other corroborating material,

except an affidavit containing the same conclusory statement, to support these generalized allegations.

Even if the shift change were properly pled and further substantiated, it would not constitute a materially adverse employment action. See Wanamaker, 108 F.3d at 466. A plaintiff sustains an adverse employment action if he or she endures a "materially adverse change" in the terms and conditions of employment. Galabya, 202 F.3d at 640. "To be 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (internal quotations omitted). While the plaintiff is protected against "less fragrant reprisals" than termination or a reduction in wages or benefits, see Wanamaker, 108 F.3d at 466, not all changes in job assignment are "material." See Galabya, 202 F.3d at 640 (reassignment then misassignment and being forced to teach outside area of expertise was not a "material" change).

"Because there are no bright-line rules, courts must pour over each case to determine whether the challenged employment action reaches the level of 'adverse.'" Wanamaker, 108 F.3d at 466. The Second Circuit has advised the district courts:

> "[t]o be "materially adverse" a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

-14-

Galabya, 202 F.3d at 640 (quotation marks and citations omitted).

The court does not find that DiBrino's alleged shift change was "materially adverse." DiBrino presents only conclusory allegations; no evidence from which the court could infer that this was unduly burdensome; no evidence of the schedules of other employees; and no evidence as to the effect on her and her work. She does not claim that the change was a demotion; was accompanied by a change in salary; entailed diminished responsibilities; or portended any other meaning that would make it "materially adverse." While such a change might affect schedule regularity, and night shifts are presumably more difficult because of sleep patterns, DiBrino does not present any evidence on these or any other effects. Moreover, "inconvenience," even if it is significant, is not always "materially adverse" with respect to a retaliation claim. Galabya, 202 F.3d at 640 (teacher assigned to less desirable school and forced to teach outside area of expertise did not present a "materially adverse" change). As a result of the considerations mentioned above, the shift assignment is insufficient to support a prima facie case of retaliation.

### 3.    Failure to Address Dispute with Oliverio

DiBrino also claims that the defendant failed to address her dispute with Oliverio in retaliation for her disability-related complaints. Even accepting as true DiBrino's allegations that the harassment and stalking continued until she went on leave in September 2001, uncontroverted evidence demonstrates that the defendant

-15-

made several attempts to respond to her claim. The Complaint recounts that the behavior began on June 10, 1999; the plaintiff complained to Yuckienuz, who held a meeting with DiBrino, Oliverio, and two union representatives on July 30, 1999. Compl. at ¶ 11. The plaintiff complained again on December 2, 1999, this time to Linda Titus, who held another meeting with DiBrino, Oliverio, and others. Compl. at ¶ 13. When DiBrino made additional complaints in February and July, 2000, the hospital made various detailed provisions to remedy the situation, including (1) for DiBrino to contact the supervisor at any time when she was feeling harassed, and for the nursing supervisor then to check with Oliverio to see why he was in the area, and to report back to DiBrino if the reasons were valid; (2) arranging shifts and supper breaks, so "except for break times there should be no other time she is off the unit and runs into Mike"; (3) for Oliverio not to respond to calls from DiBrino's assigned area. 7/29/00 Email of Kathleen Yuckienuz, Ex. 6, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. Yuckienuz's email noted, "Linda has requested that we all act immediately on Lorretta's complaints and followup with Mike. Hopefully the reassignment of Loretta will help to decrease or preven[t] these." Id.

DiBrino does not present any evidence linking the defendant's response to the complaints to her prior disability complaints. Nor is there circumstantial evidence that connects the defendant's actions with respect to the alleged harassment to the plaintiff's EEO complaint. DiBrino filed her EEO complaint in June of 1997, and

-16-

Oliverio's stalking began two years later, in June of 1999. This intervening time is too great to support an inference of a causal connection. See, e.g., Gorman-Bakos, 252 F.3d at 555 n. 5 (citing Castro v. Local 1199, 964 F. Supp. 719, 728 (S.D.N.Y. 1997)(one year is too long to show causal connection between filing of EEOC complaint and termination)).

Nor is this a case like Richardson, where supervisors failed to stop the plaintiff's fellow employees from engaging in retaliatory harassment. Richardson, 180 F.3d at 446. DiBrino does not allege that Oliverio harassed her in retaliation for her disability or disability-related complaints. See id. at 446 (employee could suffer a "materially adverse" change in the terms and conditions of her employment if her employer knew about but failed to take action to abate retaliatory harassment inflicted by co-workers). Rather, DiBrino specifically and repeatedly claims that he harassed her because she had discovered that he allegedly stored alcohol in a workplace closet and drank on the job, and sought to intimidate her into keeping silent. See, e.g., Pl.'s Opp. at 2 ("[DiBrino] believes that he may have been afraid that she would report him, and so he began to follow her.) This does not support a prima facie case of retaliatory action. Cf. Thomlison v. Sharp Elecs. Corp., No. 99 Civ. 9539, 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 18, 2000) (granting employer summary judgment on plaintiff's retaliation claim where the alleged adverse employment action was failing to investigate her claims of harassment).

In fact, the uncontroverted evidence shows that the defendant did take several actions to address DiBrino's concerns. See 7/29/00 Email of Kathleen Yuckienuz, Ex. 6, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. Hospital staff held at least two meetings with DiBrino, Oliverio, and others in July and December 1999. Compl. at ¶ 11, 13. In July 2000, the hospital made additional provisions to remedy the situation, including for DiBrino to contact the supervisor at any time when she was feeling harassed, and for the nursing supervisor then to check with Oliverio to see why he was in the area, arranging shifts and supper breaks, and for Oliverio not to respond to calls from DiBrino's assigned area. Id. For all these reasons, there is insufficient evidence to support a prima facie case of retaliation on this claim.

### 4.    Help In Processing Leave Requests/Listing As AWOL

DiBrino also claims that the defendant did not assist her with her leave requests, in retaliation for her EEO claim.[4] DiBrino also fails to establish a prima facie case on this claim.

DiBrino must point to "evidence in the record that could reasonably support a jury's verdict" in her favor. Lucente, 310 F.3d at 254. When little or no evidence supports the non-moving party's case, there is no genuine issue of material fact and summary judgment may be appropriate. Gallo, 22 F.3d at 1223-24.

---

[4]This contention is not alleged in the Complaint, but is noted in plaintiff's Local Rule 56(c)(2) Statement.

-18-

DiBrino has not presented any evidence to support a finding that the defendant took action in the form of "intentionally fail[ing] to assist her with [her] in processing her leave request for authorized absence . . . in retaliation for the complaints she had filed from 1997 - the fall of 2000." Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31] at ¶ B(7). There is no evidence that the defendant failed to assist with her requests, let alone that it was "materially adverse" and linked to her EEO complaints. Instead, DiBrino again presents only unsupported allegations. The letters presented by DiBrino as exhibits to her Local Rule 56 statement instead show that the defendant took pains to inform DiBrino of her leave options and requirements, even when she had failed to comply. For instance, though DiBrino had initially indicated that she was only interested in an Authorized Absence, which her immediate supervisors did not have the authority to grant, and not other types of leave, the defendant first charged her sick leave in order to minimize the adverse affect to your salary." 10/18/00 Letter from Linda M. Titus to Lorretta DiBrino, Ex. 9, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. Agents of the defendant alerted DiBrino to the need to file a Family Medical Leave Act form in order to receive Leave Without Pay under the Act. 12/6/00 Letter from Nancy Cabanas to Robert Reger at 1, Ex. 12, Pl.'s Local Rule 56(c)(2) Statement [Dkt. No. 31]. The defendant further agreed that though DiBrino was currently AWOL due to the lack of any approved leave, "AWOL charges will not be used to support adverse action . . . in order to give

her additional time to comply with the necessary paperwork." Id. The defendant

even outlined a procedure made to "reduce paperwork for Ms. DiBrino." Id. The

defendant wrote numerous letters warning DiBrino of her status. See, e.g., 12/6/00

Letter from Nancy Cabanas to Robert Reger at 1, Ex. 12, Pl.'s Local Rule 56(c)(2)

Statement [Dkt. No. 31]; 5/22/01 Letter from Mark Bain, Chief, Human Resources

Management Service, to Robert Reger, Ex. 21, Pl.'s Local Rule 56(c)(2) Statement

[Dkt. No. 31]. The defendant did not terminate DiBrino until she had been AWOL

for almost a year. 3/8/02 Notice, Ex. F, Def.'s Local Rule 56(a)(1) Statement [Dkt.

No. 28]; 4/10/02 Notice, Ex. G, Def.'s Local Rule 56(a)(1) Statement [Dkt. No.

28]. As a result, the court finds that DiBrino has not presented any evidence from

which a reasonable jury could infer that the defendant "intentionally failed to assist"

her in her attempt to process her request for authorized absence.

### 5.    Termination

While it is well-established that termination is "an adverse decision or course

of action," see, e.g., Richardson, 180 F.3d at 446, the plaintiff cannot establish the

required causal connection between her eventual termination in May 2002 and her

EEO complaint in the summer of 1997. The final element, a causal connection, "can

be shown either: (1) indirectly, by showing that the protected activity was followed

closely by discriminatory treatment, or through other circumstantial evidence such as

disparate treatment of fellow employees who engaged in similar conduct; or (2)

directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

DiBrino has no direct evidence of retaliatory animus, so must instead rely on circumstantial proof.  In such circumstantial cases, courts typically require that the activity and alleged adverse action be close in time.  See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001); Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 224 (2d Cir. 2001) (termination within one month of receiving plaintiff's complaint established prima facie causal connection).  While the Second Circuit has not "drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," id. (quoting Gorman-Bakos, 252 F.3d at 554, here, the facts here do not support such an connection. DiBrino filed her complaint in 1997, and was terminated in May 2002.  Indeed, DiBrino had been on leave since September 21, 2000; first on sick leave, then on leave under the Family Medical Leave Act.  She did not return to work after she exhausted her leave.  When DiBrino's last administrative complaint was dismissed, the defendant classified her as absent without leave.  She had not returned since leaving work in September 2000, and had been AWOL for almost a year when she was terminated.  3/8/02 Notice, Ex. F, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28]; 4/10/02 Notice, Ex. G, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28].

The plaintiff does not dispute that she and/or her attorney received letters from the plaintiff detailing her leave status and the material needed to make her file complete. Nor can she recall speaking directly to her supervisor after September 21, 2000. Pl.'s Dep. at 144, Ex. A, Def.'s Local Rule 56(a)(1) Statement [Dkt. No. 28]. These facts cannot support a rational inference of a relationship between the EEO complaint and DiBrino's termination years later. [5]

For all these reasons, the court finds that DiBrino has failed to present material issues of fact, precluding summary judgment on her retaliation claim.

## C.    Other Claims

DiBrino's Complaint also sets forth claims of race discrimination, sex discrimination, and failure to accommodate her disability as required by the Rehabilitation Act. The defendant requested summary judgment on these claims as well; the plaintiff's Opposition, however, only addressed the retaliation claim. As a result, the court concludes that DiBrino does not oppose summary judgment on the

---

[5] DiBrino's Complaint also alleges that her termination was partly in retaliation for her filing of this action, but she does not pursue this claim in either her Opposition to the defendant's motion or her Local Rule 56(c)(2) Statement of Disputed Facts. The court interprets this failure as a concession to the defendant's motion on this claim. Even if the plaintiff had pursued the claim, however, it would fail. DiBrino filed this lawsuit five months before she was terminated, comprised of the same facts and allegations that were the basis of DiBrino's EEO complaint four years earlier, and that, according to her own testimony, she had continued to press through administrative proceedings throughout the interim. See Compl. at ¶ 2. While the five month delay alone does not defeat an inference of causation, when combined with the other intervening circumstances, including DiBrino's continued absence without leave, the plaintiff's claim fails to support an inference of a causal connection. See Gorman-Bakos, 252 F.3d at 554 (citing cases).

other claims. This is supported by the court's review of the record, in which the plaintiff fails to produce evidence to support any of these claims, as amply detailed in the defendant's motion for summary judgment and reply. Thus, to the extent the plaintiff's Complaint pressed claims other than retaliation, summary judgment is granted on those claims as well.

## III.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment [Dkt. No. 26] is GRANTED. The clerk is directed to close this case.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 5th day of January, 2004.


_____
Janet C. Hall
United States District Judge